***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Phillips. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Phillips with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendant-employer.
3. On April 8, 2003, while delivering products to Hardee's as part of his employment with the defendant, plaintiff injured his right knee.
4. The April 8, 2003 injury occurred while plaintiff was performing assigned duties of employment with the Employer-Defendant.
5. Plaintiff received $13,923.00 from April 9, 2003 through October 7, 2003 in short-term disability benefits as a part of a short-term disability program which was completely employer funded for which defendants are entitled to some credit under N.C. Gen. Stat. § 97-42.
6. Travelers Insurance Company was the carrier on risk on the date of plaintiff's injury.
7. Plaintiff's average weekly wage is $892.50, which yields a weekly compensation rate of $595.00.
8. In addition, the parties stipulated into evidence the following:
a. Medical records from Rowan Regional Medical Center, Pro Med, Centralina Orthopaedic Sports Medicine, Piedmont Radiology, and Salisbury Anesthesia;
b. All Industrial Commission Forms filed in this matter, including Form 19, Form 61, Form 18, Form 33, and Form 33R;
c. Plaintiff's responses to defendants' interrogatories;
d. Defendants' responses to Plaintiff's interrogatories;
e. Recorded Statement Transcript of Plaintiff; and
f. Photographs of the ramp on Defendant's trucks.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 28 years old. Defendant MBM is in the business of food distribution. Plaintiff began working at MBM in February of 2002 as a truck driver and delivery person at the Salisbury, North Carolina distribution center location.
2. Plaintiff's route required deliveries to three different types of restaurants. Those restaurants were Checker's, Rally's and Hardee's. On average, 75 boxes of food would be delivered to Checker's and Rally's and approximately 200 boxes to Hardee's. The deliveries to Checker's and Rally's are referred to in the industry as a "roll-in delivery." Prior to April 2003, deliveries to Hardee's were a "tailgate delivery."
3. At the Checker's and Rally's deliveries, plaintiff's job duties consisted of driving to the restaurant, unloading the food from three separate compartments (the freezer, the cooler, and the dry goods section), loading the food onto a hand truck, and taking the food into the restaurant; hence, a "roll-in delivery." Because of the small amounts to be delivered at these restaurants, plaintiff would set the boxes at the doors of the trailer, get down out of the trailer, place the boxes on the hand truck and roll the boxes into the restaurant.
4. Prior to April of 2003, deliveries to the Hardees' were different. At Hardee's, plaintiff would set the food at the back door for a Hardee's employee to come out and pick it up; hence, a "tailgate delivery."
5. Prior to April 2003, plaintiff had never used a ramp in his unloading process. The ramp is located underneath the trailer portion of the MBM truck.
6. Plaintiff testified that although he had been trained by four different MBM truck drivers, no one had ever showed him that the ramp was there or ever showed him how to use the ramp.
7. On March 1, 2003, MBM held an employee meeting and informed their employees that they would be going from a "tailgate delivery" to a "roll-in delivery" at Hardee's.
8. During the employee meeting, the drivers were not informed that they were to begin using the ramps for their deliveries to Hardee's.
9. Beginning in April 2003, the change went into effect and Hardee's became a "roll-in delivery."
10. Approximately 75% of plaintiff's route consisted of Hardee's deliveries. Because the deliveries to the Hardee's were much larger than those to the Checker's and Rally's, plaintiff testified that he had to start using the ramp for the Hardee's deliveries because of the volume, and the fact that he only had approximately 45 minutes at each restaurant to stay on schedule.
11. Plaintiff requested a hand truck with a brake but never received one because the company had not ordered enough.
12. On April 8, 2003, plaintiff was delivering to a Hardee's at about 2:00 a.m. He stacked boxes on the hand truck and was rolling down the ramp when he felt a "pop" in his right knee. He testified that it felt like he "broke his knee," and he called the dispatcher from the phone inside Hardee's.
13. Plaintiff returned the truck to the MBM Salisbury distribution center. He was unable to work for the remainder of the day because of the pain in his right knee.
14. Plaintiff sought treatment at ProMed the morning after the injury. ProMed originally diagnosed his knee as a sprain, gave him a shot of cortizone to the knee, and wrote plaintiff a note to perform "light duties."
15. Plaintiff returned to MBM for one week where he worked in the office and in the warehouse where he could sit down.
16. On April 28, 2003, defendants denied plaintiff's workers' compensation claim. Upon denial of his claim, plaintiff was told by MBM management that he would have to leave until he got better because MBM did not have a position that fit within plaintiff's work restrictions.
17. ProMed referred plaintiff to Dr. William T. Mason, an orthopedic surgeon. Dr. Mason ordered a MRI which revealed a subchondral cyst and degenerative changes to plaintiff's knee.
18. Plaintiff was treated conservatively by Dr. Mason until July 2003, when Dr. Mason determined that plaintiff was not improving. Dr. Mason recommended and performed arthroscopic surgery on July 16, 2003.
19. On September 17, 2003, Dr. Mason noted that plaintiff was having enough pain and instability in his knee that he was afraid that he would fall going up and down the ramp if he returned to work. Dr. Mason stated that he thought it was time for plaintiff to think seriously about a different type of job.
20. On October 14, 2003, plaintiff requested a Return To Work Release from Dr. Mason so that he could begin a new job. The Return to Work Release noted that plaintiff was cleared for work in a safety-sensitive position, which may include driving large trucks.
21. In November 2003, plaintiff began working for Auto Truck Transport for approximately a month. At the end of November 2003, he began working for B.C.J. Trucking for approximately four months. Next, plaintiff started with Piedmont Transportation, and is currently working for R L Carriers as a truck driver.
22. Not one of the jobs plaintiff has had since April 8, 2003, requires or involves the use of a ramp. At each company since MBM, plaintiff was solely a truck driver. When his job required unloading, he had a lift gate and a palate jack to assist him in unloading.
23. Plaintiff's average weekly wage at MBM was $892.50. In every subsequent position he has held since April 8, 2003, his salary has been less, and on average he only works 45 hours a week.
24. During the time plaintiff was out of work, he did not receive workers' compensation, but received short-term disability for a portion of the period. The disability program was completely funded by the employer. Plaintiff concedes that defendants are entitled to some credit for the short-term disability paid pursuant to that fund.
25. Jeff Lingle, a former senior truck driver with defendant-employer, testified that he quit because of the change in procedure at Hardee's from a "tailgate delivery" to a "roll-in" delivery. Mr. Lingle testified that the change in delivery to Hardee's substantially increased the physical requirements of the truck driver position. Mr. Lingle described his usual and customary method of unloading consistent with plaintiff's testimony.
26. Walter F. Diedl, a Distribution Center Manager at the MBM location in Salisbury, testified that he has observed drivers delivering at the Rocky Mount, North Carolina plant, however, he testified he has never seen drivers deliver from the Salisbury location. He stated that prior to April 2003, there was no usual or customary procedure for a roll-in delivery, however, there was a usual or customary procedure for a tailgate delivery by MBM drivers. On March 1, 2003, a meeting was held at the MBM distribution center to introduce drivers to the changes that were taking place at the Hardee's locations. At no point during this meeting was there any mention to the drivers of the necessity to begin using the ramps. There was no announcement during the meeting that such demonstration was to take place. Mr. Diedl confirmed that MBM had not ordered enough hand trucks with brakes for each driver.
27. Albert A. Feely, a truck driver at MBM testified that prior to April, 2003, whether one used a ramp or not, "varied from driver to driver." Following a brief break in his employment he returned to work for defendant-employer in September 2003, and testified that he commonly used the ramp in his deliveries because there is less stress on his joints.
28. Dr. Mason, an expert in the field of orthopedic surgery, first examined plaintiff on May 6, 2003. Dr. Mason recalled from his notes that plaintiff had been using a hand truck to move merchandise up and down a ramp, and when he did, he had pain in his right knee and his knee gave way.
29. Dr. Mason ordered an MRI which revealed plaintiff's knee had severe chondromalacia of the subpatella surface. On July 3, 2003, Dr. Mason noted that plaintiff had not improved and recommended surgery which was performed on July 16, 2003.
30. Dr. Mason's postoperative diagnosis was severe chondromalacia of the patella, which is indicative of a degenerative disease. Dr. Mason explained that chondromalacia is a condition which develops over years, and is a condition that can be aggravated by particular types of activities.
31. Dr. Mason testified that in his opinion, plaintiff's activity on April 8, 2003, materially aggravated his pre-existing condition of chondromalacia in his right knee.
32. Dr. Mason kept plaintiff out of work from May 6, 2003 until October 14, 2003, but submitted a return to work release for plaintiff because he wanted to begin working again.
33. The greater weight of the evidence shows that using the hand truck on the ramp constituted an interruption of plaintiff's normal work routine. As plaintiff was guiding the hand truck down the ramp, the lack of a hand brake made it difficult to control the hand truck and plaintiff suffered an unexpected injury by accident and resulted in injury to plaintiff's knee.
34. The greater weight of the evidence shows that plaintiff's chondromalacia was aggravated by the compensable injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff's injury of April 8, 2004, constitutes an injury by accident within the meaning of N.C. Gen. Stat. § 97-2(6). Injury by accident is "an unlooked for and untoward event which is not expected or designed by the person who suffers the injury." Vaughan v. Nash HealthCare Sys. Inc., N.C. App. LEXIS 1308 (2004), quoting Porter v. ShelbyKnit, Inc., 46 N.C. App. 22, 26, 264 S.E.2d 360, 363 (1980). An "accident" involves the interruption of the normal work routine and the presence of unusual conditions likely to result in unexpected consequences. Id. New conditions of employment to which an employee is introduced and expected to perform regularly do not become a part of an employee's work routine until they have in fact become routine.
2. Plaintiff is entitled to temporary total benefits form April 28, 2003 until October 14, 2003. N.C. Gen. Stat. § 97-29.
3. At the time of the hearing, Plaintiff had not yet been rated by Dr. Mason. Plaintiff could not make any informed decision concerning an election of remedies between N.G. Gen. Stat. §§ 97-30 and 97-31.
4. Defendants are entitled for a credit for short-term disability payments. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff is entitled to temporary total disability benefits from April 8, 2003 until October 14, 2003.
2. Defendants are entitled to a credit for short-term disability paid.
3. A reasonable attorney fee for plaintiff's counsel of twenty-five percent (25%) of the compensation due plaintiff under Paragraph 1 of this AWARD is approved, and shall be paid directly to plaintiff's counsel.
4. Issues regarding further indemnity benefits due to plaintiff should be reserved pending an election of benefits by plaintiff.
5. Defendants shall pay costs.
This the 1st day of August, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER